## PURCHASE OF STOCK CONTRARY TO A POOLING AGREEMENT.

Circuit Court of Cuyahoga County.

ELIZABETH METZLER ET AL v. THE MASON STEAM LAUNDRY.

Decided, November 4, 1904.

*Equity—One Who Demands Equity Must do Equity.*

Where the subscribers to a stockholders pooling agreement have never done anything to put the agreement into effect and for a term of years have ignored its existence, one of the subscribers, who has himself purchased stock in violation of the agreement can not afterwards insist upon the carrying out of the agreement by the others while refusing to surrender to the pool the stock which he, himself, had purchased.

*Jas. F. Walsh* and *White, Johnson, McCaslin & Cannon,* for plaintiffs.

*Foran, McTighe & Gage,* contra.

WINCH, J.; HALE J., and MARVIN, J., concur.

The Mason Steam Laundry Company was incorporated January 3, 1894, with an authorized capital of $10,000, divided

into 100 shares. On the fifth day of January, 1894, the incorporators of the company duly ordered books of subscription to stock to be opened and on the same day twenty-five shares of stock were subscribed for, directors were elected and the company organized.

By the terms of an instrument dated January 5, 1894, and signed by all of the stockholders of the company, each and every one of the subscribers agreed that for a period of five years no one of them would sell any of the stock which he held in the company, except to the other subscribers thereto, jointly, upon a valuation to be agreed upon, if possible, and, if not, to be fixed by arbitration, and each and all of the subscribers agree to buy any such stock so offered, jointly for the benefit of all of the subscribers at the valuation so to be fixed. It was further agreed that the subscribers should assign their stock to G. E. Milligan, one of the directors of the company, in trust to secure the performance of the agreement. By a like instrument signed January 5, 1899, the same agreements were extended for a further period of four years, or until January 5, 1903, the directors of the company for the time being and their successors in office being substituted for Milligan as trustees to whom the subscribers' stock should be assigned in trust; both of these agreements provided that at the termination of the periods therein named said trustees should reassign the stock to the respective owners.

No such assignments of the stock to the trustees were ever made, but the stock certificates, after being properly signed by the officers of the company, were never removed from the stock certificate book which remained in the custody of the officers of the company.

Section X of the rules and regulations adopted by the stockholders provides as follows:

"The stock book of the corporation shall remain in the custody of the secretary and treasurer, who shall have control thereof, and not more than twenty-five shares of the capital stock of the company shall be sold without the consent of four-fifths of the board of directors and then only when it appears that it is necessary that more money shall be had in order to conduct and carry on the business of the corporation."

While the subscribers to the pooling agreements mentioned do not appear to have complied with its terms to the extent of themselves purchasing stock of subscribers who desired to sell, the evidence shows some of the subscribers desired to dispose of their stock during periods covered by said agreements and gave notice of their desires, whereupon the Mason Steam Laundry Company out of its own funds purchased certain of its own stock, the several transactions and amounts paid by the company being as follows: June 13, 1895, T. E. Milligan, 4-1/3 shares, $500; June 10, 1898, Annie Kearney, 1 share, $337; June 8, 1901, Nellie Carroll, 1/2 share, $50; July 15, 1901, Rose Callaghan, 1 share, $100, being in all 6-5/6 shares, and $987.50 being expended by the company in the purchase thereof and all the certificates representing said shares were duly assigned to the "Mason Steam Laundry Company."

November 28, 1903, and after the bringing of this suit, but before any relief with reference thereto was prayed for by any of the pleadings, the Mason Steam Laundry Company sold the 4 1/3 shares of stock it had purchased of Milligan to J. T. Murphy, who paid for it the par value thereof.

The only other shares of stock which have changed hands are 1½ shares purchased previous to January 5, 1903, by R. A. Butler, one of the plaintiffs in this suit, director and secretary of the company and one of the original subscribers for stock and of the pooling agreements. He testifies that he bought these shares with the knowledge of the company and the other subscribers and because they were unable to purchase them. While the evidence does not bear him out in all these claims, it does not appear that the other subscribers after they had knowledge of these purchases by Butler ever offered to buy said shares or made any tender with reference thereto or complaint with regard thereof, except as complaint is made by cross-petition filed in this case.

At a regular meeting of the board of directors of the company held April 1, 1901, Butler being absent, the other four directors voted for and passed the following resolution: "Authorized more stock issued to help pay off the indebtedness of Mason Laundry Company."

The minutes of the next regular monthly meeting of the company held May 6, 1901, all five directors being present, set forth the following:

"On motion.  Limited to ten shares of stock issued to help pay off the indebtedness of Mason Laundry Company bills: Anna Colgan, four shares of stock; Maggie McIntyre, two shares of stock; Anna McNamara, two shares of stock; Hannah Larkins, two shares of stock.  On motion ten shares of stock issued to the four above named."

Butler protested against this action on the ground that the issue of stock was illegal and he then and there refused to take any of said shares.  The other four directors voted for the motion and two of them were named in it as persons to whom the stock should be issued.

May 10, 1901, certificates of stock for ten shares were duly issued to the persons named in the resolution of May 6, but said certificates were never removed from the stock certificate book. Said shares were paid for and the company received cash to the par value thereof, which is used in paying part of its indebtedness.

August 2, 1901, Butler and Metzler filed their petition in the common pleas court praying that the defendant corporation be restrained from delivering said ten shares of stock to defendants, and that on the final hearing said sale of stock to be set aside and the defendants ordered to deliver up said certificates and that they be canceled.

By subsequent pleadings filed in the common pleas court and in this court, where the case was brought on appeal, issues have been made up as to the several transactions mentioned and we are now asked by plaintiffs not only to set aside said issue of ten shares, but also to set aside the transfer to Murphy of the 4 1/3 shares; on the other side defendants ask that Butler be decreed to hold the 1 1/2 shares of stock purchased by him, as trustee for all the stockholders and subscribers to the pooling agreement.

Considering the questions raised chronologically and not attempting to set forth all the facts upon which our conclusions are based, we first take up the pooling agreements.

Plaintiffs claim that these contracts, so far as they are executory, are illegal, being in restraint of alienation and are also without consideration, for the agreement to buy is at a price to be agreed upon, and if not agreed upon, then fixed by arbitration and, if so agreed upon or arbitrated, upon breach of the agreement the stockholder desiring to sell and still holding his stock would be entitled in damages only to the difference between the real value of his stock and the price agreed to be paid; there being no difference between the two there would be no damage, hence no consideration for the promise to buy. So far as executed, the plaintiff claims the pooling agreements are legal. Urging this distinction between executory and executed contracts of illegal character, plaintiff says that as to the 4 1-3 shares of stock sold by Milligan to the company the contract was executed, the company became the owner thereof as trustee for all the stockholders, that he is entitled to his pro rata share thereof and that the subsequent sale of said 4 1-3 shares to Murphy, who knew all the facts, was illegal and should be set aside for plaintiffs' benefit.

As to the 1½ shares purchased by himself, Butler says he is not bound by the agreement to hold the same in trust for the other stockholders, because as to this 1½ shares the pooling agreement is not executed, and said agreement being illegal, he can not be bound by it.

In other words, Butler asks the benefit of the pooling agreement as to the 4 1/3 shares of stock, but himself declines to live up to the spirit of it as to his 1½ shares. This narrow ground upon which Butler stands does not give him an assured position before a court a court of equity. It was with much force that counsel for defendants suggested to the court that the time honored maxims "He who comes into equity must come with clean hands," and, "He who asks equity must do equity," were not mere platitudes, but should be applied in this case.

The conclusions we have arrived at are in accord with such rules, but are based upon more specific reasons. We find as a fact, that the pooling contracts were never lived up to or acted upon by anybody. No stock was ever presented to the trustee for purchase, none was ever purchased by the trustees; it was

presented by consent of all persons to the directors of the corporation for purchase. The 6 5/6 shares were bought by the directors of the corporation in behalf of the corporation, were paid for by the corporation funds, and were assigned to the corporation. This was done with the assent of everybody.

As to these shares the agreement was disregarded from the beginning.

We find the same to be true with regard to the 1½ shares purchased by Butler.

We leave these purchases and sales where the parties left them and no relief is granted to either party under said pooling agreement.

It follows that the company, having made an unlawful use of its funds in the purchase of its own stock, not only had a right, but it was its duty, to resell the same and return to the treasury the funds thus improperly expended. It has attempted to do so with regard to the Milligan stock, resold to Murphy, and we find said sale was a fair one and should be confirmed.

There remains for consideration the issue of ten shares of additional stock, the sale of which was authorized in April and confirmed in May, 1901.

We hold that the stock books were not closed after the subscription for the original twenty-five shares and that the effect of Section X of the rules and regulations of the company was but a direction of the stockholders to the directors to go carefully in receiving further subscriptions. When the section was adopted twenty-five shares *had* been sold without consent of four-fifths of the directors, for then there were no directors, but having provided for the election of directors, the stockholders limited their discretion as to the issue of additional stock, requiring of them a four-fifths vote and their judgment as to the necessity of a sale of stock as a means of procuring more money in order to conduct and carry on the business of the corporation.

We find that on April 1, 1901, four-fifths of the directors duly authorized the sale of ten additional shares and that a necessity then existed for the sale thereof to procure funds to pay the debts of the corporation, then existing, in order that the business of the company might be continued.

We find that the sale of these shares at par was for their full value. Indeed, we doubt if the stock at that time was worth par intrinsically.

The evidence as to the good faith of the directors in selling part of this stock to themselves is not entirely satisfactory; we are inclined to think all stockholders should have been notified that the ten shares were to be sold and that the four directors should not have trusted their own judgment that no other stockholders were able to take additional stock. One of the directors testified that all but three of the stockholders were notified of the additional stock to be sold. Butler was a director and admits he knew on Saturday before the meeting on Monday, May 6th, that additional stock was to be sold. On May 6th, he could have applied for his share of the additional ten shares. He declined to do so and said he would not take additional stock, but gave a bad reason for his refusal; the issue was legal if made in good faith. As to the other plaintiff, Mrs. Metzler, there is little evidence. But that both plaintiffs, if they were in anywise prejudiced by the confirmation of the sale by the directors on May 6th, to two of their own number, have slept on their rights, there is no question. The stock was not paid for nor issued until four days later, yet they took no prompt steps to restrain the directors from issuing the stock or receiving pay therefor. They did nothing for three months; they knew of the financial difficulties of the company growing out of its connection with the Cuyahoga Savings & Banking Company, which failed just at that time, but they did nothing to help the company out, did not offer to take stock, stood by and let the defendants use their own money and after the company had finally been put upon its feet again, they at last determined, not that they wanted part of said shares, but that they did not want the subscribers for the ten shares to keep them, and so they brought suit after three months inaction. We hold that they were too late to be entitled to the relief they now ask, in pleadings subsequently filed, that they have part of said ten shares, and finding no equities in the petition, it is dismissed, as are also all cross-petitions, each party to pay his own costs.